IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>BRIAN BIFF BAKER,<br><br>        Defendant. | ORDER AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:12-cr-204 |

      Defendant Brian Biff Baker has moved to suppress all statements that he made during his interview with the police on February 2, 2012. Mr. Baker has almost moved to suppress the evidence that was obtained from a search of his car. Because the court finds that Mr. Baker's alleged attempt to invoke his Miranda rights was ambiguous, and because the seizure of Mr. Baker's car was supported by probable cause, the court DENIES his motion (Dkt. No. 36).

BACKGROUND

      On February 2, 2012, an informant called the Salt Lake City police department and told them that she had received a number of text messages that contained threats to Governor Gary R. Herbert. (Tr. of Ev. Hr'g 7:23-25, 8:1-6, June 28, 2012, Dkt. No. 32.) The informant said that these messages had been sent to her by Brian Biff Baker, a man whom she had met a few weeks earlier through Facebook. (Id. at 47:3-6.) Several officers were sent to inspect the area around the Governor's mansion and to look for Mr. Baker on foot. (Id. at 9:7-14.) The officers also

pinged the cell phone that was associated with the text messages.[1]  (Id. at 8:25-9:5.)  The ping showed that the cell phone was a few blocks from the Governor's mansion, around 40 South 900 East.  (Id. at 9:5.)  Officer Scott Nesbitt, who was one of the lead officers on the case, asked the informant to lure Mr. Baker to a nearby gas station under the pretense of loaning him some gas money.  (Id. at 15:10-25.)  The informant sent the requested texts to Mr. Baker, who agreed to meet her at a Smith's gas station at 873 East South Temple.  (Id. at 16:1-6.)

The police called SWAT officers to the scene because Mr. Baker's texts suggested that he had several small arms, including an assault rifle.  (Id. at 16:11-17:13.)  The informant also stated that seven weeks earlier she had seen an assault rifle in Mr. Baker's apartment.  (Id. at 46:11-21.)  Around 9:27 p.m., the police found Mr. Baker at the Smith's station and arrested him without incident.  (Id. at 16:15-24.)  They drove him to the Salt Lake City Police Department and put him in an interview room where he was met by Officer Nesbitt.  (Id. at 19:8-14.)

Officer Nesbitt told Mr. Baker that he wanted to take Mr. Baker back to his office to talk about Mr. Baker's case.  (Id. at 19:17-19.)  Mr. Baker became angry and stated that he did not want to go to Officer Nesbitt's office.  (Id. at 19:22-23.)  He testified that he told Officer Nesbitt, "I don't have anything to say to you," but Officer Nesbitt does not remember this statement.  (Id. at 98:8-9.)  Officer Nesbitt drove Mr. Baker to his office anyway.  (Id. at 19:24-25.)  During the drive, Mr. Baker told Officer Nesbitt that he was angry with the government, that he was dying of cancer, and that he made weapons of mass destruction for a living.  (Id. at 35:11-21.)

---

[1] In other words, the officers located the tower origin of the last signal the phone received and used this information to determine the general area where the phone might be.  (See Tr. at 9:2-5.)

Once at Officer Nesbitt's office, Mr. Baker was informed of his <u>Miranda</u> rights and agreed to waive them. (<u>Id.</u> at 22:4-8.) Officer Nesbitt then began to ask Mr. Baker questions about the text messages. (<u>Id.</u> at 24:11-13.) Mr. Baker insisted that the messages were a joke. (<u>Id.</u> at 24:19-20.) He also admitted that he had fireworks in his car, specifically M-80s and bottle rockets, and ammunition that belonged to a friend. (<u>Id.</u> at 24:24-25:5, 41:1-3.) He denied that there were any firearms. (<u>Id.</u> at 25:4.) At one point during the interview, Officer Nesbitt asked if Mr. Baker's friend liked to duck hunt. (<u>Id.</u> at 41:4-21.) Officer Nesbitt left the room a number of times and returned with new information and questions for Mr. Baker. (<u>See, e.g.</u>, <u>id.</u> at 38:15-23.)

After about two hours of questioning, Officer Nesbitt asked Mr. Baker to sign a "consent to search" form for his cell phone and car. (<u>Id.</u> at 26:2-22.) Mr. Baker signed the form, but told Officer Nesbitt that he was going to tell the court that he was forced into signing it. (<u>Id.</u> at 27:19-21.) The interview then ended when Mr. Baker requested an attorney. (<u>Id.</u> at 29:20-24.)

While Officer Nesbitt was questioning Mr. Baker, Agent Mary Kaye Lucas found Mr. Baker's car near the intersection of L Street and South Temple. (<u>Id.</u> at 56:5-58:19.) Agent Lucas waited for Sergeant Jerry Garcia to arrive and then attempted to open the car, but the doors were locked. (<u>Id.</u> at 63:1-17.) From the outside of the car, the officers could not see anything illegal inside the car but noticed that the car was cluttered with metal ammunition canisters, computers, pillows, and blankets. (<u>Id.</u> at 65:1-22.) Officer Lucas called a wrecker, and at 10:48 p.m. the car was towed to a secure warehouse. (<u>Id.</u> at 66:17-25; 67:11-19.)

The next day, officers obtained a search warrant and conducted a full search of Mr. Baker's car. (<u>Id.</u> at 29:6-15.) Officers found firearm ammunition, a knife, M-88 and M-800

3

explosives, firecrackers and other fireworks, and drug contraband and paraphernalia. (Id. at 30:13-23; Def.'s Mem. Supp. Mot. Suppress, at 4, Dkt. No. 37.) The officers also found a camouflage backpack with duck hunting gear that belonged to Mr. Baker's son-in-law. (Tr. at 43:14-16, 101:14-16.) Mr. Baker was later charged with Threatening Use of Explosives, Transmitting Threats in Interstate Commerce, Felon in Possession of Ammunition, and Possession of Methamphetamine.

ANALYSIS

The Fifth Amendment of the United States Constitution commands that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const. Amend. V. The Supreme Court has held that this privilege against self-incrimination prohibits the admission of statements that were made by a suspect during "custodial interrogation" if that suspect was not informed of his Fifth Amendment rights. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. If a defendant in a custodial interrogation setting "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent" then the interrogation must immediately cease. Id. at 473-74.

But to invoke one's right to remain silent under Miranda, the invocation must be made "unambiguously." Davis v. United States, 512 U.S. 452, 459 (1994). In United States v. Rambo, 365 F.3d 906 (10th Cir. 2004), the Tenth Circuit clarified what constitutes a clear and unambiguous invocation of the right to remain silent. In Rambo, the defendant was arrested on charges of aggravated robbery. Id. at 907. One of the officers explained to the defendant the

4

charges that he and his co-defendant were facing and then asked the defendant, "[D]o you want to talk to me about this stuff?" Id. at 908. The defendant responded, "No." Id. The officer then continued to talk to the defendant about what was going to happen next and reminded the defendant of his Miranda rights. Id. The defendant waived those rights and gave a complete confession to the police. Id. at 909. The Tenth Circuit held that the defendant's initial response of "no" was sufficient to show a clear and unambiguous invocation of his right to remain silent and that any statements made thereafter by the defendant should be suppressed. Id. at 910-11.

Mr. Baker argues that his statements should be similarly suppressed. He claims that his statement, "I don't have anything to say to you,"[2] clearly and unambiguously invoked his right to remain silent. The court is not persuaded by this argument for a number of reasons. First, unlike the circumstances in Rambo, Mr. Baker's statement was not made in response to a direct question from Officer Nesbitt. In Rambo, the suspect's statement that the Tenth Circuit held was sufficient to invoke his right to remain silent occurred during a videotaped interview with a police officer. See id. at 907-08. And while Mr. Baker was certainly in custody when he made his statement, Officer Nesbitt had not yet initiated any questioning. Instead, Officer Nesbitt was attempting to get Mr. Baker to go with him to his office at another location and to speak with him there. In this context, Mr. Baker's statement is more expressive of his desire not to go with Officer Nesbitt than his desire to remain silent. Mr. Baker's statement is not the sort of response that carries "no nuance [or] context to vary the unequivocal meaning." Id. at 910.

---

[2]While there is some dispute between Mr. Baker and Officer Nesbitt about whether Mr. Baker really made this statement, the court adopts Mr. Baker's version of events for the purposes of this argument.

5

Second, Mr. Baker did not exhibit a desire to remain silent while he was in the car with Officer Nesbitt on the way to Officer Nesbitt's office. During this time, Mr. Baker made several statements about his anger towards the government and the weapons of mass destruction that he alleged he made for a living. (Tr. at 35:11-21.) It is unclear from the transcript if these statements were made in response to questions from Officer Nesbitt or if Mr. Baker offered them spontaneously, but Mr. Baker described the conversation as "personal small talk" and never reiterated his statement that he had nothing to say. (Id. at 98:12-23.) Finally, Mr. Baker's manner during this time and during the later interview was calm and open. (Id. at 22:17-25.) Officer Nesbitt testified that Mr. Baker appeared perfectly coherent when he waived his Miranda rights and answered Officer Nesbitt's questions. (Id. at 22:10-12.) For all of these reasons, the court finds that Mr. Baker did not unambiguously invoke his right to remain silent.

The court also agrees with the government that there was probable cause to seize Mr. Baker's car. The Fourth Amendment of the United States Constitution requires that the government perform searches and seizures in a reasonable manner, which usually requires searches and seizures to be based on probable cause and executed after obtaining a warrant. U.S. Const. Amend. IV; see Katz v. United States, 389 U.S. 347, 357 (1967) (imposing presumptive warrant requirement for searches and seizures). But under the automobile exception to the warrant requirement, officers may search a car without a warrant if the officers have probable cause to do so. United States v. Mercado, 307 F.3d 1226, 1228 (10th Cir. 2002). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." United States v. Downs, 151 F.3d 1301, 1303 (10th Cir. 1998) (citation omitted), cert. denied, 526 U.S. 1078 (1999).

Here, the police had evidence that a cell phone associated with Mr. Baker was sending text messages that threatened the Governor and contained references to assault weapons and explosions. (See Gov't Exs. 1.8, 1.21.) The informant who brought this matter to the police's attention also told officers that she had seen an assault rifle in Mr. Baker's apartment. (Tr. at 46:11-21.) Mr. Baker's car was eventually located a few blocks from the Governor's mansion. These facts suggest that there was a "fair probability that the car contain[ed] contraband or evidence." Downs, 151 F.3d at 1303. Moreover, Mr. Baker's car was not searched until officers had obtained a search warrant. As a result, the issue here is not whether Mr. Baker's car was searched without a warrant, but whether it was seized and towed to a secure location in violation of Mr. Baker's Fourth Amendment rights. The court notes that even if the car should have been left on the street until officers had obtained the search warrant, it was inevitable that the police would eventually move Mr. Baker's car and conduct a thorough search.

Mr. Baker claims that Agent Lucas's version of events is incorrect and that the police officers did search his car before they obtained a warrant. But the only support that Mr. Baker cites for his argument is Officer Nesbitt's question about whether Mr. Baker's car contained any duck hunting gear. Because duck hunting gear was eventually found inside a zipped backpack in Mr. Baker's car, Mr. Baker believes that Officer Nesbitt would not have asked him this question unless the police had already conducted a warrantless search and relayed information about that search to Officer Nesbitt. The court is not persuaded that Officer Nesbitt's duck hunting question can support such an inference. Mr. Baker has not presented any other evidence that would support a finding of an improper search, and Officer Nesbitt's question is more likely to be a coincidence than a sign of government wrongdoing.

ORDER

Based on the reasons set forth above, Mr. Baker's Motion to Suppress (Dkt. No. 36) is DENIED. This motion contains the same arguments as another motion that was previously filed by Mr. Baker on May 22, 2012 (Dkt. No. 22). Because the arguments are the same, the court also DENIES the earlier motion. Finally, the motion for clarification of counsel (Dkt. No. 24) is terminated as a result of the hearing on this motion that was held on June 26, 2012 (Dkt. No. 30).

SO ORDERED this 11th day of September, 2012.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
U.S. District Court Judge